1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
                   AT SEATTLE

9

10   A.T.,                              CASE NO. C16-1536JLR

11              Plaintiff,              ORDER ON MOTIONS FOR
                                        SUMMARY JUDGMENT
        v.
12

13   EVERETT SCHOOL DISTRICT, et
     al.,
14
                Defendants.
15

16                        I.   INTRODUCTION

17        This matter comes before the court on Defendants Everett School District and

18   Carol Whitehead's (collectively, "the District") first and second motions for summary

19   judgment (1st MSJ (Dkt. # 57); 2d MSJ (Dkt. # 59)), and Defendant Craig Verver's

20   motion for summary judgment (Verver MSJ (Dkt. # 61)).  A.T. opposes the motions (*see*

21   1st Resp. (Dkt. # 63); 2d Resp. (Dkt. # 69); Verver Resp. (Dkt. # 68)), and all Defendants

22   have filed replies (*see* 1st Reply (Dkt. # 66); 2d Reply (Dkt. # 74); Verver Reply (Dkt.

1    # 77)).  Having considered these submissions, the relevant portions of the record, and the

2    applicable law, the court, considering itself fully advised, GRANTS the District's first

3    motion for summary judgment (1st MSJ) and GRANTS Mr. Verver's motion for

4    summary judgment (Verver MSJ).  The court also DENIES the District's second motion

5    for summary judgment (2d MSJ) as moot.  Accordingly, the court dismisses this case

6    with prejudice.

7    ## II.    BACKGROUND

8    A.T.[1] attended Cascade High School in the Everett School District from 1999 to

9    2003.  (1st Resp. at 6.)  Mr. Verver was one of A.T.'s teachers during the 2001-2002 and

10   2002-2003 school years.  (*Id.* at 6; *see also* SAC (Dkt. # 28) ¶ 7.)  A.T. was also a cabinet

11   member of the National Honor Society, for which Mr. Verver served as a faculty adviser.

12   (1st Resp. at 6.)  During the 2001-2002 school year, Mr. Verver singled out A.T. in class,

13   teased her,[2] and gave her special attention.  (*Id.*; *see also* Cochran Decl. (Dkt. # 65) ¶ 15,

14   Ex. N ("A.T. Interrogatories") at 202.)  Mr. Verver told A.T. that she would need to take

15   "calculated risks" to be exceptional enough to stand out for college admissions.  (SAC

16   ¶ 9.)  At the end of the school year, Mr. Verver encouraged A.T. to run for Honor Society

17   president, a position that required working closely with him in his capacity as faculty

18   adviser.  (*Id.* ¶ 10.)  A.T. was elected Honor Society president for the following year, and

19

20   [1] The court previously granted A.T. permission to proceed under a pseudonym.  (MTD Order (Dkt. # 27) at 2 n.3.)

21   [2] The court is aware that A.T. now goes by a different first name and uses the pronouns

22   "they" and "them."  (*See, e.g.*, Leitch Decl. (Dkt. # 58) ¶¶ 6, 14, Ex. D at 19, Ex. L at 3.)  For consistency and clarity, the court refers to A.T. as "her" and "she."

1   Mr. Verver gave A.T. his personal contact information so that they could be in touch over

2   the summer.  (*Id.*; 1st Resp. at 6.)

3          In October 2002, while A.T. was 17-years-old, A.T. attended a school dance.

4   (A.T. Interrogatories at 198.)  After the dance, A.T. stayed to help clean up.  (*Id.*)  While

5   there, Mr. Verver kept A.T. for hours and engaged her in conversation about their

6   "unique relationship."  (*Id.*)  Mr. Verver also told A.T. that "he worried about his role in

7   her life and was envious of her parents because A.T. might leave him after graduation

8   while she would always be her parents' child."  (SAC ¶ 11.)  Mr. Verver expressed to

9   A.T. that he was concerned about her future and protective of who she may choose to

10  date or marry.  (*Id.*)  Mr. Verver also shared with A.T. that he was having marital

11  problems.  (A.T. Interrogatories at 198.)  At the end of their conversation, Mr. Verver

12  gave A.T. "a very long and close hug."  (*Id.*)  After this date, Mr. Verver frequently

13  hugged A.T. closely when she left his classroom if she had been there on the weekends or

14  after school.  (*Id.* at 200.)

15         Around two weeks after the school dance, Mr. Verver confided in A.T. that his

16  wife was pregnant and that he was "crushed about the news."  (*Id.* at 198-99.)  A.T. also

17  began confiding in Mr. Verver about her relationships with boys.  (*Id.* at 199.)  During

18  one conversation, A.T. told Mr. Verver that she was uncomfortable being physical with

19  her boyfriends.  (*Id.*)  In response, Mr. Verver sat next to A.T. on the couch in his

20  classroom and asked, "[D]o you feel uncomfortable about me sitting here?"  (*Id.*)  He

21  then put his hand on A.T.'s thigh and asked A.T. whether she would be able to say "no"

22  if a date put his hand on her thigh.  (*Id.*)

1    A.T. turned 18 on January 5, 2003. (SAC ¶ 14.) Later that month, she visited Mr.

2  Verver's classroom. (*Id.*) Mr. Verver greeted A.T. with a hug and a kiss on the cheek.

3  (*Id.*; *see also* A.T. Interrogatories at 203.) The next time A.T. saw Mr. Verver, he asked

4  her how she felt about the kiss. (A.T. Interrogatories at 203.) A.T. told Mr. Verver that it

5  made her nervous. (*Id.*) Mr. Verver kissed her again on the cheek. (*Id.*)

6    At the end of January 2003, A.T. was in Mr. Verver's classroom on a weekend.

7  (*Id.* at 204.) Mr. Verver told A.T. that he was going to "steal a kiss" and kissed A.T. on

8  the mouth. (*Id.*) A.T. became "physically upset" and "started trembling and twitching

9  uncontrollably." (*Id.*) Mr. Verver told A.T. that he was going to "steal another kiss" and

10  kissed her again. (*Id.*) Mr. Verver suggested that they move to the couch, and Mr.

11  Verver kissed A.T. and tried to put his hands up her shirt, though A.T. resisted. (*Id.*)

12  A.T. felt "humiliated" and "scared" about making Mr. Verver angry "if she said that

13  wasn't what she wanted" and "blamed herself for making him have that

14  misunderstanding." (*Id.* at 204-05.) When A.T. returned home that day, she "hid in her

15  closet" and cried uncontrollably. (*Id.* at 205.) The next school day, Mr. Verver pulled

16  A.T. aside before school started to discuss what had happened between them. (*Id.*) Mr.

17  Verver told A.T. it could never happen again, but then pulled her in and kissed her,

18  saying, "[W]ell, we both knew we couldn't help ourselves." (*Id.*)

19    The sexual relationship between A.T. and Mr. Verver continued to escalate. (*Id.* at

20  205-06.) After school, on the weekends, and even sometimes during school hours, Mr.

21  Verver would invite A.T. into his classroom, lock the door, and engage in intimate

22  contact with A.T. (*Id.*) The sexual contact occurred two to three times a week for the

1   rest of A.T.'s senior year, ranging from kissing to sexual intercourse. (*Id.* at 205-11.)

2   The first time A.T. and Mr. Verver had sexual intercourse was on April 26, 2003. (*Id.* at

3   208.) A.T. went to Mr. Verver's classroom to gather supplies for a car wash. (*Id.*) Mr.

4   Verver produced a condom and asked A.T. to put one on him. (*Id.*) A.T. hesitated, and

5   Mr. Verver told her, "If you want me to wear this then you have to put it on me." (*Id.*)

6   A.T. acquiesced, and the two had sexual intercourse. (*Id.*) After this encounter, Mr.

7   Verver and A.T. had sex on multiple occasions in his classroom and in other locations at

8   the school. (*Id.* at 210.)

9       Throughout the 2002-2003 school year, teachers who frequently stopped by Mr.

10  Verver's classroom after school and on the weekends would find A.T in his classroom.

11  (SAC ¶ 19.) On some occasions, Mr. Verver's door was locked. (*Id.*) Upon Mr. Verver

12  opening the door, teachers would find A.T. on his couch. (*Id.*) In addition, teachers also

13  saw Mr. Verver give A.T. rides home from school. (*Id.*)

14      A.T. graduated from high school in summer 2003, and began attending the

15  University of Washington that fall. (1st Resp. at 8-9; A.T. Interrogatories at 213-14.)

16  A.T. eventually graduated from the University of Washington in 2008, with bachelor's

17  degrees in English and French. (*Id.*) While A.T. studied at the University of

18  Washington, she and Mr. Verver continued their sexual relationship. (1st Resp. at 9.) On

19  January 8, 2006, A.T. journaled about discussing the relationship with Mr. Verver:

20  "[A]nd then we moved onto the topic of possible damage done and why we yet don't

21  stop." (Leitch Decl. ¶ 4, Ex. B at 2.)

22  //

1    In fall 2008, A.T. began graduate school at UCLA to pursue a PhD in French

2    Studies. (1st Resp. at 9.) Near the end of 2009, A.T. was teaching an undergraduate

3    French class when she had a "significant reaction" to being the teacher in a classroom of

4    students. (*Id.*) A.T. subsequently fainted on campus, and her PhD supervisor advised her

5    to see a therapist. (*Id.*) A.T. took her supervisor's advice and sought counseling at

6    UCLA. (*Id.*)

7    At the beginning of her therapy sessions, A.T. told the therapist that she had an

8    "on and off" relationship with an older married man. (*Id.* at 9-10.) On April 18, 2010,

9    A.T. told the therapist that she felt guilty and frustrated with aspects of her relationship

10   with Mr. Verver. (*Id.* at 10.) A.T. received her first psychological diagnosis at this

11   session: Adjustment Disorder with Mixed Anxiety and Depressed Mood. (*Id.*)

12   Around September 2011, A.T. moved abroad to Cambridge to continue her

13   studies. (*Id.*) In June 2012, A.T. returned to UCLA to defend her dissertation

14   prospectus. (*Id.*) On this trip, she traveled to Seattle to confront Mr. Verver and tell him

15   that she no longer wanted a sexual relationship with him. (*Id.* at 10-11.) Mr. Verver

16   agreed to stop the sexual relationship, but on the way home from dinner, Mr. Verver

17   pulled over in an abandoned parking lot, undid his pants, and demanded oral sex. (A.T.

18   Interrogatories at 219.) A.T. "numbly complied." (*Id.*) After Mr. Verver ejaculated, he

19   "laughed, let out a satisfied sigh, and said . . . '*now* I guess it's okay if you go.'" (*Id.*)

20   After A.T. returned to Cambridge, she journaled extensively about the

21   relationship. In a January 29, 2012, entry—when A.T. was 27-years-old—A.T. wrote

22   that she "feel[s] damaged by [the] relationship." (Leitch Decl. ¶ 5, Ex. C at 3.) On

September 12, 2012, A.T. wrote an email to her PhD supervisor at UCLA regarding the

relationship and the grief it caused her. (*Id.* ¶ 7, Ex. E at 3.) A.T. explained in this email

that, since she taught her French class in 2009, she "realized the power dynamics that had

been operative . . . [and] had a really difficult time teaching that whole year." (*Id.*)  On

September 27, 2012, A.T. called Mr. Verver. (*Id.* ¶ 9, Ex. G at 2-3.) A.T. detailed the

phone call in her journal: "I think this is when I let loose a flood of my feelings and hurt

and shame about everything . . . about wanting to kill myself, about feeling like I had

zero integrity . . . and that I felt groomed and manipulated, regardless of whether he

meant to." (*Id.* at 3.)

The next day, on September 28, 2012, A.T. went to Cambridge University

Counseling Service. (*Id.*; *see also* Cochran Decl. ¶ 11, Ex. J ("Cambridge Counseling")

at 146.) A.T. wrote her reason for seeking counseling services was because she was

"getting out of a harmful relationship and [she] need[s] some help right now while [she's]

feeling very fragile." (Cambridge Counseling at 146.) A.T. further explained:

> The relationship was with a teacher, and it began while I was still in his class
> . . . I have only just recently (like, for two months) allowed myself to think
> about this relationship as harmful, and admitting that has been incredibly
> painful. . . . This whole thing shuts me down fairly often (where I don't get
> out of bed or eat really for several days at a time); I used to think of harming
> myself, but not for the last two years.

(*Id.*) Around this time, the people A.T. confided in about the relationship described Mr.

Verver's actions as "abuse" and "coercion" and "grooming." (Leitch Decl., Ex. D at 11.)

While A.T. was at Cambridge, she had been exploring her sexual and gender

identity. (1st Resp. at 10-11.) A.T. eventually began to identify as genderqueer and

1    married another genderqueer individual, Jack, in October 2013. (Cochran Decl. ¶ 2, Ex.

2    A ("A.T. Depo. Vol. 1") at 4.)

3        A.T. returned to the United States in 2013. (1st Resp. at 11.) On April 24, 2013,

4    A.T. again sought therapy at UCLA. (Leitch Decl. ¶ 11, Ex. I at 3.) On the intake form,

5    A.T. reported "ongoing issues around an abusive relationship," and that she was

6    concerned about "Anxiety, fears, or nervousness . . . Depression . . . [and] Sexual abuse

7    or assault." (Id.) A.T. also wrote that she was previously in counseling "six months ago

8    for the sexual abuse issues." (Id.) A.T. then met with the counselor, who noted A.T.'s

9    diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Id. at 5.)

10        A.T. returned to UCLA counseling in May 2013, telling the therapist that she was

11    in "recovery from a past power abusive relationship with [a] former teacher." (Leitch

12    Decl. ¶ 12, Ex. J at 3.) A.T. also reported that she became aware of the power abusive

13    nature of the relationship when she started a teaching role in graduate school (presumably

14    referring to the 2009 French class). (Id.) The counselor noted that A.T. had symptoms of

15    anxiety, depression, and difficulty concentrating, and reiterated A.T.'s diagnosis of

16    Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Id. at 3-4.)

17        A.T. completed the fall 2013 quarter at UCLA, but then quit her PhD program

18    because she "had a lot going on" and "never obtained secure housing." (1st Resp. at

19    11-12.) A.T. and Jack then moved to San Francisco where A.T. worked as a

20    housekeeper. (Id. at 12-13.) In February 2015, A.T. had a double mastectomy to obtain a

21    "more masculine torso profile." (Cochran Decl. ¶ 3, Ex. B at 62.)

22

1    In fall 2015, A.T. went to two job fairs to consider becoming a substitute teacher

2  and going back to school to earn a teaching certificate. (1st Resp. at 12.) At both events,

3  A.T. was "unusually hypervigilant." (*Id.*) Looking around the room at these events, A.T.

4  was overwhelmed with the thought that all of these people could be abusing or hurting

5  students, and that A.T. becoming a teacher would make her complicit in the abuse. (*Id.*)

6  At the second event, A.T. had a panic attack. (*Id.*) A.T. alleges that fall 2015:

7          [I]s when she realized that she had suffered an actual psychological injury
            due to Craig Verver's actions: When she realized that the physical and
8          psychological consequences of his abuse prevented her from successfully
            pursuing the career that she had trained for, and prevented her from being
9          able to complete her graduate degree.

10  (*Id.*) A.T. claims that she "first saw an attorney relating to anything Verver" in

11  November 2015, after the job fairs. (*Id.* at 13.) After A.T. described her history with Mr.

12  Verver to the attorney, the attorney confirmed that A.T. could file a lawsuit. (*Id.*)

13    In November or December 2016, A.T. saw her primary care physician. (A.T.

14  Depo. Vol. 1 at 7.) At this appointment, her doctor diagnosed A.T. with Posttraumatic

15  Stress Disorder ("PTSD"). (*Id.*) This was the first time A.T. was diagnosed with PTSD.

16  (*Id.*) According to A.T., however, "ever since things began with Craig Verver," she has

17  "experienced nightmares and different manifestations of PTSD, anxiety kind of things,

18  [and] hypervigilance." (*Id.*) A.T. is not sure when she "would call that PTSD because

19  . . . [her] understanding of that[ disease] evolved," but "it was most disorienting after

20  [she] ended contact with [Mr. Verver] in 2012." (*Id.*)

21  //

22  //

1      A.T.'s expert consultant for this case, Dr. Gilbert Kliman, reviewed A.T.'s

2   medical records and relevant testimony, and described A.T.'s situation in the following

3   manner:

> The situation of the plaintiff is like that of a person who at one point has a
> minor seeming skin rash and does not know that it is going to proceed to be
> a major disorder, Lyme Disease, which will affect many systems of her
> body. . . .
>
> In this case, the plaintiff years ago received diagnoses of adjustment reaction
> disorder, a minor disorder which is defined as a reaction to a stressor. The
> stressor was identified as a relationship with a married former teacher of the
> stressed person. The plaintiff was aware of the stressor, but she was not
> aware of the future consequences of which we now know. Nor could she
> have been aware. . . .
>
> [PTSD] is a major mental disorder which went undiagnosed by a mental
> health professional until 2016.

11   (Kliman Decl. (Dkt. # 64) ¶¶ 7-9.) Dr. Kliman admitted that A.T. "underwent fairly

12   significant therapy in 2012." (Cochran Decl. ¶ 5, Ex. D ("Kliman Depo.") at 84.) But,

13   according to Dr. Kliman, PTSD is different from A.T.'s earlier diagnoses of anxiety,

14   depression, and adjustment reaction disorder. (*Id.* at 86 (explaining that "PTSD is not

15   considered an anxiety disorder," that PTSD is "clearly differentiated" from depression,

16   and that PTSD is not the same as "adjustment reaction disorder . . . by a long shot").)

17      On August 23, 2016, A.T. "presented" a tort claim to the District. (1st MSJ at 7;

18   1st Resp. at 14; Leitch Decl. ¶ 16, Ex. N); *see also* RCW 4.96.020(2) ("A claim is

19   deemed presented when the claim form is delivered in person or is received" by the

20   entity's designated agent"). On September 30, 2016, A.T. filed her first complaint in the

21   present case, asserting 42 U.S.C. § 1983 claims against Mr. Verver and the District, and

1   Title IX claims against the Everett School District only. (*See generally* Compl. (Dkt.

2   # 1).)  A.T. alleges that Mr. Verver sexually "groomed" and assaulted her in violation of

3   the Ninth and Fourteenth Amendments of the United States Constitution.  (SAC ¶ 25.)

4   A.T. further alleges that the District acted deliberately indifferent to her wellbeing, safety,

5   and educational environment in violation of the Ninth and Fourteenth Amendments as

6   well as Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).  (*Id.*

7   ¶¶ 26-27.)  A.T. seeks compensatory and punitive damages for the violation of her

8   constitutional rights as well as "mental anguish and emotional distress." (*Id.* ¶¶ 23-24.)

9   On October 17, 2016, A.T. amended her complaint to add state law claims of negligence

10  and negligent infliction of emotional distress against the Everett School District based on

11  its negligent training, retention, and supervision of Mr. Verver.  (FAC (Dkt. # 7)

12  ¶¶ 26-27; *see also* SAC ¶¶ 28-29.)

13        On October 27, 2016, Mr. Verver filed a motion to dismiss on the basis that A.T.'s

14  claims were time-barred by the applicable statutes of limitations.  (*See generally* MTD

15  (Dkt. # 12).)  The court granted the motion, finding that A.T. had not clearly alleged

16  when she discovered her injury.  (*See generally* MTD Order.)  The court simultaneously

17  granted A.T. leave to amend her complaint to remedy the deficiencies.  (*Id.* at 8.)  On

18  March 3, 2017, A.T. amended her complaint to say that she "did not know or even begin

19  to understand the extent of her injuries and damages until 2015." (SAC ¶ 21.)

20  Defendants contend that A.T.'s second amended complaint alleges injuries that began

21  accruing no later than May 2013, making A.T.'s claims untimely.  (*See generally* 1st

22  MSJ; Verver MSJ.)

1

# III.   ANALYSIS

2

## A.   Summary Judgment Standard

3        Summary judgment is appropriate if the evidence, when viewed in the light most

4 favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

5 any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

6 P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*,

7 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

8 there is no genuine issue of material fact and that he or she is entitled to prevail as a

9 matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden,

10 then the nonmoving party "must make a showing sufficient to establish a genuine dispute

11 of material fact regarding the existence of the essential elements of his case that he must

12 prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.

13        In determining whether the fact-finder could reasonably find in the nonmoving

14 party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

15 party, and it may not make credibility determinations or weigh the evidence." *Reeves v.*

16 *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Nevertheless, the

17 nonmoving party "must do more than simply show that there is some metaphysical doubt

18 as to the material facts . . . . Where the record taken as a whole could not lead a rational

19 trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v.*

20 *Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita*

21 *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  The court may

22

1   only consider admissible evidence when ruling on a motion for summary judgment. *Orr*

2   *v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).

3   **B.    Statute of Limitations**

4          The statute of limitations period for a 42 U.S.C. § 1983 claim is "that of the forum

5   state's statute of limitations for personal injury torts." *Elliot v. City of Union City*, 25

6   F.3d 800, 802 (9th Cir. 1994).  Title IX claims also borrow the forum state's personal

7   injury tort limitations period. *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1134

8   (9th Cir. 2006).  In Washington, personal injury torts have a three-year statute of

9   limitations period. *Joshua v. Newell*, 871 F.2d 884, 886 (9th Cir. 1989); RCW

10  4.16.080(2).  Therefore, in a Washington forum, the statute of limitations for a

11  section 1983 claim and a Title IX claim, as well as the torts of negligence and negligent

12  infliction of emotional distress, is three years. *See RK Ventures, Inc. v. City of Seattle*,

13  307 F.3d 1045, 1058 (9th Cir. 2002).  Although the parties dispute whether A.T.'s state

14  law claims implicate RCW 4.16.340—Washington's statutory discovery rule for actions

15  based on childhood sexual abuse—the statute of limitations under this provision is also

16  three years.  RCW 4.16.340(1).  Therefore, the applicable limitations period for all of

17  A.T.'s claims is three years.

18  **C.    Effective Filing Date of A.T.'s Complaint**

19          Before analyzing when the statute of limitations for A.T.'s claims began to accrue,

20  the court will first determine the effective filing date of A.T.'s complaint.  Only the

21  District briefly mentioned this issue, stating that it "considers August 23, 2016[,] as the

22

1    effective filing date" for all of A.T.'s claims.  (*See* 1st MSJ at 13 n.2.)  The District's

2    analysis is incorrect.

3         When a party wishes to commence a tort action for damages against a local

4    government entity, the party must first "present" the tort claim to that entity.  RCW

5    4.96.020(2)-(4).  A party cannot commence the action until 60 days after presenting the

6    claim.  RCW 4.96.020(4).  "A claim is deemed presented when the claim form is

7    delivered in person or is received" by the entity's designated agent.  RCW 4.96.020(2).

8    The applicable statute of limitations period is "tolled during the sixty calendar day

9    period."  RCW 4.96.020(4); *see Boston v. Kitsap Cty.*, 852 F.3d 1182, 1189 (9th Cir.

10   2017) (if a plaintiff timely submits a claim under RCW 4.96.020, "his statute of

11   limitations is automatically three years and 60 days").  Because RCW 4.96.020 is a

12   "special statute of limitations," and not a "tolling statute," RCW 4.96.020 only applies to

13   state claims. *See Boston*, 852 F.3d at 1188-89; *cf. Harding v. Galceran*, 889 F.2d 906,

14   909 (9th Cir. 1989) ("federal law requires this court to apply state tolling rules").  Courts

15   should liberally construe RCW 4.96.020's procedural requirements "so that substantial

16   compliance will be deemed satisfactory."  RCW 4.96.020(5).  In Washington, substantial

17   compliance with a statutory requirement means that the "statute has been followed

18   sufficiently so as to carry out the intent for which the statute was adopted." *Banner*

19   *Realty, Inc. v. Dep't of Revenue*, 638 P.2d 279, 281 (Wash. Ct. App. 1987) (internal

20   citation omitted).  "The purpose of claim filing statutes is to 'allow government entities

21   time to investigate, evaluate, and settle claims.'" *Lee v Metro Parks Tacoma*, 335 P.3d

22

1    1014, 1017 (Wash. Ct. App. 2014) (quoting *Medina v. Pub. Util. Dist. No. 1 of Benton*

2    *Cty.*, 53 P.3d 993, 997 (Wash. 2002)).

3         A.T. sent a state tort claim notice to the District on August 16, 2016, but the claim

4    was not "presented" to the District until August 23, 2016. (*See* Leitch Decl., Ex. N

5    (A.T.'s tort claim notice letter is dated August 16, 2016, but the District's "received"

6    stamp is dated August 23, 2016)); *see also* RCW 4.96.020(2). A.T. filed her first

7    complaint with the court on September 30, 2016, alleging only the federal section 1983

8    and Title IX claims. (*See* Compl.) On October 17, 2016, 55 days after the claim was

9    presented to the District, A.T. amended her complaint to add the state law negligence

10   claims—perhaps believing that August 16, 2016, was the operative date that triggered the

11   60-day period. (*See* FAC.) Nonetheless, pursuant to RCW 4.96.020(5), the court will

12   liberally construe A.T.'s actions as substantially complying with RCW 4.96.020 such that

13   the effective filing date for her state tort claims is October 22, 2016[3]—60 days after her

14   claims were "presented" to the District. Therefore, A.T.'s state claims must have begun

15   to accrue within three years and 60 days before October 22, 2016, to be timely. *See*

16   RCW 4.96.020(4). Conversely, because RCW 4.96.020 does not apply to federal claims,

17   the effective filing date for A.T.'s section 1983 and Title IX claims is the date of her first

18   complaint: September 30, 2016. (*See generally* Compl.); *see also Boston*, 852 F.3d at

19   //

20

21        [3] October 22, 2016, is a Saturday. A.T. would have been permitted to commence this
     action on Monday, October 24, 2016, the next court day. Fed. R. Civ. P. 6(a)(3). But the statute

22   of limitations is extended only for "the sixty calendar period" after the claim has been presented,
     making October 22, 2016 the appropriate date. RCW 4.96.020(4).

1    1188-89.  Therefore, A.T.'s federal claims must have begun to accrue within three years

2    of September 30, 2016, to be timely.

3    **D.      Discovery Rules**

4          The parties agree that A.T.'s claims of abuse occurred more than three years

5    before this lawsuit was filed.  (*See generally* 1st MSJ; Verver MSJ; 1st Resp.)

6    Accordingly, A.T.'s claims are untimely unless they are saved by either a common law

7    discovery rule or a statutory discovery rule such as RCW 4.16.340.  The court will first

8    determine the applicable state law discovery rule and apply it to A.T.'s state claims.  The

9    court will then determine the applicable federal law discovery rule and apply it to A.T's

10   federal claims.  For the following reasons, under both the state and federal analyses,

11   A.T.'s claims are untimely.

12          1.   A.T.'s State Law Negligence Claims are Untimely

13          Under the Washington common law discovery rule, the limitations period for

14   negligence claims begin to accrue when "a claimant knows, or in the exercise of due

15   diligence should have known, all the essential elements of the cause of action,

16   specifically duty, breach, causation and damages." *Funkhouser v. Wilson*, 950 P.2d 501,

17   512 (Wash. Ct. App. 1998) (quoting *In re Estates of Hibbard*, 826 P.2d 690, 698 (Wash.

18   1992)).  State law claims that implicate RCW 4.16.340's discovery rule, however, begin

19   to accrue at the later of the following periods:  (a) when the act occurred that caused the

20   injury occurred; (b) when "the victim discovered or reasonably should have discovered

21   that the injury or condition was caused by said act"; or (c) when "the victim discovered

22   that the act caused the injury for which the claim is brought."  RCW 4.16.340(1)(a)-(c).

1   RCW 4.16.340 was enacted to provide a "broad and generous application of the

2   discovery rule to civil actions for injuries caused by childhood sexual abuse." *C.J.C. v.*

3   *Corp. of Catholic Bishop of Yakima*, 985 P.2d 262, 269 (Wash. 1999).

4          By its terms, RCW 4.16.340 applies to "[a]ll claims or causes of action based on

5   intentional conduct brought by any person for recovery of damages for injury suffered as

6   a result of childhood sexual abuse." RCW 4.16.340(1). "Childhood sexual abuse" is

7   defined as "any act committed by the defendant against a complainant who was less than

8   eighteen years of age at the time of the act and which act would have been a violation of

9   chapter 9A.44 RCW or RCW 9.68A.040." RCW 4.16.340(5). Under RCW 9A.44.096,

10  sexual misconduct with a minor in the second degree includes when "the person is a

11  school employee who has . . . sexual contact with an enrolled student of the school who is

12  at least sixteen years old and not more than twenty-one years old and not married to the

13  employee, if the employee is at least sixty months older than the student." RCW

14  9A.44.096(1)(b). Lastly, "sexual contact" includes "any touching of the sexual or other

15  intimate parts of a person done for the purpose of gratifying sexual desire of either party

16  or a third party." RCW 9A.44.010(2). Therefore, as relevant here, if Mr. Verver

17  "sexually contacted" A.T. before she turned 18, then RCW 4.16.340's statutory discovery

18  rule will apply.

19         The Defendants argue that A.T. was 18-years-old when the first "sexual contact"

20  between A.T. and Mr. Verver occurred, making RCW 4.16.340 inapplicable. (*See* 1st

21  MSJ at 9-10; Verver Mot. at 11-12.) Conversely, A.T. argues that Mr. Verver's "hugs

22

1    and the touching of her thigh" while she was 17 qualify as sexual contact, thus

2    implicating RCW 4.16.340. (*See* 1st Resp. at 16-17 n.91.)

3          For purposes of the "sexual contact" definition, "[t]he determination of which

4    anatomical areas apart from the genitalia and breasts are intimate is a question to be

5    resolved by the trier of the facts." *In re Welfare of Adams*, 601 P.2d 995, 997 (Wash. Ct.

6    App. 1979) (internal citation omitted). In determining what is an "intimate part" under

7    RCW 9A.44.010(2), the trier of fact should ask whether "a person of common

8    intelligence has fair notice that the nonconsensual touching of [the body part] is

9    prohibited, particularly if that touching is incidental to other activities which are intended

10   to promote sexual gratification of the actor." *Id*. The trier of fact should also consult

11   "commonly accepted community sense of decency, propriety and morality." *Id*. Under

12   this test, hips have been considered an intimate body part such that touching them is

13   "sexual contact." *Id*. The factfinder should also consider whether the adult initiated the

14   touching for "sexual gratification." *See State v. Powell*, 816 P.2d 86, 88 (Wash. Ct. App.

15   1991).

16         Here, a reasonable jury could find that Mr. Verver's "very long and close" hugs

17   and touching of A.T.'s thigh while A.T. was 17-years-old constituted "sexual contact."

18   (*See* A.T. Interrogatories at 199-200.) Additionally, a reasonable factfinder could find

19   that Mr. Verver conducted this touching for his sexual gratification. *See* RCW

20   4.16.340(5); *see also* RCW 9A.44.096(1)(b); RCW 9A.44.010(2). The court will

21   therefore use RCW 4.16.340's statutory discovery rule to analyze the limitations period

22   for A.T.'s state law claims.

1     RCW 4.16.340 provides three different accrual points for a limitations period.

2   RCW 4.16.340(1)(a)-(c).  A.T. appears to rely only on RCW 4.16.340(1)(c),[4] claiming

3   that she did not make the causal connection between Mr. Verver's acts and her injuries

4   until the fall 2015 job fairs.  Under section 1(c), the statute of limitations begins to run

5   when the victim "discovers the causal connection between the defendant's acts and the

6   injuries for which the claim is brought." *Hollmann*, 949 P.2d at 387; *Korst v. McMahon*,

7   148 P.3d 1081, 1084 (Wash. Ct. App. 2006) (RCW 4.16.340(1)(c) "specifically focuses

8   on when a victim of sexual abuse discovers the causal link between the abuse and the

9   injury for which the suit is brought.").

10     In crafting RCW 4.16.340, the Washington legislature noted, among other things,

11   that "[e]ven though victims may be aware of injuries related to the childhood sexual

12   abuse, more serious injuries may be discovered later." *Funkhouser*, 950 P.2d at 513

13   (quoting 1991 Wash. Sess. Laws 1084).  RCW 4.16.340(1)(c) accounts for the fact that

14   victims of childhood sexual abuse may know that they have been affected in some way

15   by the abuse, but they may not appreciate the more serious injury until a later date.

16   *Korst*, 148 P.3d at 1085.  Only when the more serious injury arises, and the victim makes

17   the causal connection between the abuse and injury, will the statute of limitations begin

18   to run. *Id.*  Courts therefore apply section (1)(c) in two circumstances: "(1) where there

19

20     [4] A.T. does not argue that the court should apply RCW 4.16.340(1)(a), which starts a
limitations period when the act that caused the injury occurred.  Nor does A.T. argue that
21   4.16.340(1)(b) applies, which "addresses repressed memory claims where the victim discovers
his or her injury or condition was caused by a previously undiscovered act." *Hollmann v.
22   Corcoran*, 949 P.2d 386, 392 (Wash. Ct. App. 1997).  A.T. does not allege that she repressed her
memory of the acts with Mr. Verver.

1   has been evidence that the harm being sued upon is qualitatively different from other

2   harms connected to the abuse which the plaintiff had experienced previously, or (2)

3   where the plaintiff had not previously connected the recent harm to the abuse." *Carollo*

4   *v. Dahl*, 240 P.3d 1172, 1174 (Wash. Ct. App. 2010).  But courts are clear that RCW

5   4.16.340(1)(c) does not say that the limitations period resets every time a victim's

6   injuries worsen.  *See id.* at 1175 (declining to restart the statute of limitations when the

7   victim's already-present problems worsened).  Instead, if a victim has already connected

8   her injury to the abuse, the statute of limitations will reset only for a new, "qualitatively

9   different" injury.  *Id.* at 1174.

10         A.T. argues that her 2016 PTSD diagnosis is "vastly different" than her previous

11   injury.  (*See* 1st Resp. at 24-25.)  The court recognizes that PTSD is a different diagnosis

12   than A.T.'s earlier diagnoses of Adjustment Disorder with Mixed Anxiety and Depressed

13   Mood.  (*See* Kliman Depo. at 86).  But RCW 4.16.340(1)(c) speaks of "injury," not of

14   "diagnosis."  *Carollo*, 240 P.3d at 1175.  Put another way, for purposes of RCW

15   4.16.340(1)(c), the injury is the "problems associated with" the diagnosis, not the

16   diagnosis itself.  *Id.*

17         As A.T. herself explained:

18         I've experienced nightmares and different manifestations of PTSD, anxiety
           kind of things, hypervigilance, ever since things began with Craig Verver in
19         an inappropriate and secretive way. . . . I don't know when I would call that
           PTSD because . . . my understanding of that's evolved. . . . I think it was most
20         disorienting after I ended contact with him in 2012.

21   (A.T. Depo. Vol. 1 at 7.)  Thus, in the light most favorable to A.T., there is no genuine

22   dispute of material fact that A.T.'s problems associated with PTSD are, at most, a

1    quantitative difference from her previous problems, for which she first received a

2    diagnosis in April 2010. (Leitch Decl., Ex. B at 10.)

3         The present case is analogous to *Carollo v. Dahl*, 240 P.3d 1172 (Wash. Ct. App.

4    2010). Mr. Carollo was a childhood abuse victim who sought counseling in 1988 for

5    emotional difficulties. *Id.* at 1173. The counselor told Mr. Carollo that his difficulties

6    were likely due to the molestation. *Id.* Mr. Carollo sought counseling again in 1995,

7    when he was diagnosed with PTSD symptoms, including depression and nightmares

8    related to the molestation. *Id.* In 2008, Mr. Carollo's PTSD symptoms significantly

9    worsened, causing him to lose his employment. *Id.* Mr. Carollo saw another therapist

10   who explained that PTSD symptoms can "wax and wane over time." *Id.* The therapist

11   further diagnosed Mr. Carollo with panic disorder, major anxiety, and major depressive

12   disorder in 2008. *Id.* Later in 2008, Mr. Carollo filed a lawsuit against his abuser.

13   Similar to A.T., Mr. Carollo claimed that "the severity of his most recent symptoms"

14   should restart the statute of limitations. *Id.* at 1175. In holding that Mr. Carollo's claims

15   were time-barred, the court explained that "[t]he injury here is the psychological

16   problems associated with PTSD." *Id.* According to the court, Mr. Carollo's 2008

17   problems were not qualitatively different than the problems he had connected to his

18   abuser's acts "as early as 1988" before his first PTSD diagnosis. *Id.* Although Mr.

19   Carollo's injuries grew more severe, RCW 4.16.340(1)(c) "says nothing about quantity of

20   harm." *Id.* Rather, "it speaks of 'injury' and connection of 'injury' to 'acts.'" *Id.* The

21   court explained that RCW 4.16.340(1)(c) only restarts the limitations period "for *different*

22

1    injuries discovered at different times rather than applying to more severe manifestations

2    of a prior injury." *Id.*

3         It is instructive that the court in *Carollo* did not consider Mr. Carollo's new 2008

4    diagnoses of panic disorder, major anxiety, and major depressive disorder to be

5    "qualitatively different" from his previous problems associated with PTSD. *Id.* at 1173,

6    1175. Nor did the court find that Mr. Carollo's "new symptoms, such as memory loss,"

7    warrant a finding that Mr. Carollo suffered a different injury for purposes of RCW

8    4.16.340. *Id.* at 1175. Thus, Dr. Kliman's assessment that "PTSD is not considered an

9    anxiety disorder," that PTSD is "clearly differentiated" from depression, and that PTSD

10   is not the same as "adjustment reaction disorder . . . by a long shot" (Kliman Depo. at

11   86), does not compel a finding that A.T. suffered a "different injury" for the purposes of

12   RCW 4.16.340(1)(c), *see Carollo*, 240 P.3d at 1175. To the contrary, according to A.T.

13   to A.T., her symptoms reached their peak in 2012, well before the PTSD diagnosis. (A.T.

14   Depo. Vol. 1 at 7.)

15        In short, RCW 4.16.340(1)(c) does not halt a statute of limitations until a victim's

16   long-present symptoms are given the proper name. Here, there is no genuine dispute of

17   material fact that A.T. began suffering her injury at least by May 2013, at which point she

18   had been diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood

19   by three separate therapists. At most, A.T.'s PTSD is a quantitatively different injury for

20   which the statute of limitations will not start anew.

21        A.T. also argues that her state claims should not begin to accrue until fall 2015

22   because that is the first time she made the causal connection between her injury and Mr.

1   Verver's actions, after becoming "unusually hypervigilant" at two job fairs and suffering

2   a panic attack. (1st Resp. at 12.) The undisputed facts, however, show otherwise. In the

3   light most favorable to A.T., A.T. associated her problems with Mr. Verver's abuse by

4   May 2013, at the latest.

5       A.T. sought counseling at UCLA in 2010 after a "significant reaction" while

6   teaching an undergraduate French class. (1st Resp. at 9.) A.T. told the counselor about

7   her relationship with Mr. Verver, and the counselor diagnosed A.T. with Adjustment

8   Disorder with Mixed Anxiety and Depressed Mood. (*Id.* at 9-10.) A.T. also journaled in

9   January 2012 that she felt "damaged by [the] relationship" with Mr. Verver. (Leitch

10  Decl., Ex. C at 3.) In September 2012, A.T. told her PhD supervisor about Mr. Verver

11  and that how, in 2009, she "realized the power dynamics that had been operation . . .

12  [and] had a really difficult time teaching that whole year." (*Id.*, Ex. E at 3.) Also in

13  September 2012, A.T. journaled that she "felt groomed and manipulated" by Mr. Verver.

14  (*Id.*, Ex. G at 3.) A.T. saw a second counselor at the end of September 2012, this time at

15  Cambridge, to seek help after "getting out of a harmful relationship," that she "only just

16  recently (like, for two months) allowed [herself] to think about this relationship as

17  harmful." (Cambridge Counseling at 146.) A.T. additionally told the Cambridge

18  counselor that her relationship with Mr. Verver "shuts [her] down fairly often," causing

19  her to not get out of bed or eat for several days at a time. (*Id.*) In spring 2013, after

20  returning to the United States, A.T. again sought counseling at UCLA for "ongoing issues

21  around an abusive relationship," and "Anxiety, fears, or nervousness . . . Depression . . .

22  [and] Sexual abuse or assault." (Leitch Decl., Ex. I at 3.) A.T. last saw the UCLA

ORDER - 23

1 | counselor in May 2013, at which time the counselor noted that A.T. had symptoms of

2 | anxiety, depression, and difficulty concentrating. (*Id.*, Ex. J at 3-4.)

3 |      On this undisputed evidence, the court finds that there is no genuine dispute as to

4 | any material fact that, by May 2013, A.T. made the causal connection between her

5 | injuries and Mr. Verver's alleged abuse.

6 |      A.T.'s facts are distinguishable from the cases she relies upon. (*See* 1st Resp. at

7 | 16-20 (citing *Korst*, 148 P.3d 1081; *Holloman*, 949 P.2d 86). In *Korst v. McMahon*, for

8 | example, a woman sued her parents for harms caused by her father's rape when she was

9 | 13-years-old. 148 P.3d at 1082-83. In finding that the plaintiff's claims were timely, the

10 | court noted that, while the plaintiff had previously recognized that she resented her father

11 | for the abuse, she was not aware that the abuse had caused her the physical and emotional

12 | symptoms that she complained of in her suit. *Id.* at 1085. Here, by contrast, A.T. was

13 | aware of the injury that underlies this suit by May 2013, even if her injury now has a

14 | different name.

15 |      In *Holloman v. Corcoran*, the plaintiff sued his childhood abuser. 949 P.2d at

16 | 390. Mr. Holloman was diagnosed with PTSD twice by two different counselors, once in

17 | 1989 and once in 1994. *Id.* at 389-90. The court found that Mr. Holloman's 1995

18 | lawsuit was not time-barred because, even though he was diagnosed with PTSD more

19 | than three years prior to the lawsuit, Mr. Holloman did not connect the first diagnosis to

20 | the abuse. *Id.* at 392. Only during the 1994 diagnosis did Mr. Hollman make the causal

21 | connection between the abuse and his injury. In the present case, however, A.T.

22 | connected her harms to Mr. Verver's abuse by at least May 2013 when she saw her third

1   therapist for harm related to Mr. Verver, noting specifically that she was seeking help for

2   "ongoing issues around an abusive relationship." (Leitch Decl., Ex. I at 3.)

3          In sum, A.T. did not suffer a different injury in 2016 when she was diagnosed

4   with PTSD stemming from symptoms that, according to A.T., reached their peak in 2012.

5   (A.T. Depo. Vol. 1 at 7.)  A.T.'s injury has remained the same for years even if she first

6   received the PTSD diagnosis in 2016.  Nor did A.T. first connect her injury to Mr.

7   Verver's abuse at the job fairs in 2015.  By May 2013, A.T. had seen three therapists for

8   her injuries related to Mr. Verver's actions.  At least by May 2013, A.T. made the causal

9   connection between Mr. Verver's acts and her injury that forms the basis of her claims.

10         May 2013 is more than three years and 60 days before the October 22, 2016,

11  effective filing date.  Therefore, the court finds that A.T.'s state law negligence and

12  negligent infliction of emotional distress claims are untimely.

13         2.  A.T.'s Federal Claims are Untimely

14         Although state law "determines the length of the limitations period, federal law

15  determines when a civil rights claim accrues." *Lukovsky v. City and Cty. of S.F.*, 535

16  F.3d 1044, 1048 (9th Cir. 2008).  Under the federal common law discovery rule, the

17  limitations period for A.T.'s section 1983 and Title IX claims begin to accrue "when the

18  plaintiff knows or has reason to know of the injury which is the basis of the action." *Id*.

19  The parties do not dispute that the federal common law discovery rule applies to A.T.'s

20  federal civil rights claims. (*See* Verver MSJ at 8; 1st Resp. at 25; 1st Reply at 10.)

21         For the reasons stated above, the court finds that there is no genuine dispute of

22  material fact that, by May 2013, A.T. knew or had reason to know of the injury which is

1    the basis of her federal claims. *See supra* § III.D.1; *see also Lukovsky*, 535 F.3d at 1048.

2    Therefore, A.T.'s section 1983 and Title IX claims are also untimely. A.T., however,

3    makes an additional argument regarding her federal claims' accrual that the court now

4    addresses.

5          On August 9, 2017, A.T. deposed Sarah Kelsey, a teacher at Cascade High School

6    when A.T. attended school there. (Cochran Decl. ¶ 7, Ex. F at 113.) Ms. Kelsey testified

7    that she was aware that another teacher saw Mr. Verver "caressing" A.T.'s face in an

8    "oddly intimate" way on the couch in Mr. Verver's classroom in the early 2000s. (*Id.*)

9    Ms. Kelsey reported this incident to then Principal James Dean at that time. (*Id.*) Ms.

10   Kelsey, however, did not know if Mr. Dean ever acted on her report. (*Id.*) A.T.

11   subsequently deposed Mr. Dean on November 14, 2017. (*See* Cochran Decl. ¶ 8, Ex. G.)

12   In that deposition, Mr. Dean testified that he did not remember Ms. Kelsey telling him

13   about the caressing incident, nor does he remember ever investigating Mr. Verver. (*Id.* at

14   123-24.)

15         Based on this information, A.T. argues that she only learned about the District's

16   knowledge of Mr. Verver's abuse—and therefore its deliberate indifference—after

17   deposing Ms. Kelsey and Mr. Dean. (*See* 1st Resp. at 29); *see also Reese v. Jefferson*

18   *Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (holding a school district liable for

19   damages under Title IX "only where it has 'actual knowledge' of the abuse"); *Duvall v.*

20   *Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("Deliberate indifference requires

21   both knowledge that harm to a federal protected right is substantially likely, and a failure

22   to act upon that . . . likelihood."). A.T. appears to argue that the new information she

1  learned from Ms. Kelsey and Mr. Dean should somehow restart the limitations period for

2  her federal claims. (*See* 1st Resp. at 29.) To the extent that is A.T.'s argument, it is not

3  correct.

4        The federal discovery rule focuses on "when the plaintiff knows or has reason to

5  know of the *injury* which is the basis of the action." *Lukovsky*, 535 F.3d at 1048

6  (emphasis added). The rule does not, as A.T. suggests, focus on when the plaintiff learns

7  that the "injury constitutes a legal wrong." *Id.* at 1049 (citing *Oshiver v. Levin, Fishbein,*

8  *Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994)). In other words, A.T.'s federal

9  claims began to accrue when she knew or had reason to know of the injury that forms the

10  basis of her federal claims, not when A.T. learned an additional fact about the District's

11  alleged knowledge that would bolster her claims. Moreover, although A.T. may have

12  found support for aspects of her claims through the discovery process, uncovering better

13  evidence does not restart the statute of limitations for an already pleaded claim. *See*

14  *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006)

15  ("[F]ederal courts have repeatedly held that plaintiffs seeking to toll the statute of

16  limitations on various grounds must have included the allegation in their pleadings; this

17  rule applies even where the tolling argument is raised in opposition to summary

18  judgment.") (collecting cases).

19        Thus, the court finds that there is no genuine dispute of material fact that A.T.

20  knew or had reason to know of the injury which forms the basis of her federal claims by

21  May 2013. May 2013 is more than three years before A.T. filed her federal claims on

22  September 30, 2016. A.T.'s federal claims are therefore untimely.

1

## IV.   CONCLUSION

2      For the foregoing reasons, the court GRANTS the District's first motion for

3  summary judgment (Dkt. # 57) and GRANTS Mr. Verver's motion for summary

4  judgment (Dkt. # 61).  The court also DENIES the District's second motion for summary

5  judgment (Dkt. # 59) as moot.  Accordingly, the court dismisses this case with prejudice.

6      Dated this 9 day of January, 2018.

7

8
JAMES L. ROBART
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22